18020-014
SCM/dla

Stanley J. Marks- State Bar #001833
Serena C. Montague - State Bar #014562
BEGAM & MARKS, P. A.
111 West Monroe Street, Suite 1400
Phoenix, Arizona 85003-1787
(602) 254-6071

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DAVID B. PATTON, II., | ) |
| | ) Cause No. |
| Plaintiff, | ) |
| v. | ) |
| | ) COMPLAINT AND JURY DEMAND |
| I-FLOW CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

Plaintiff, DAVID B. PATTON, II., by and through undersigned counsel, and for his Complaint against the Defendant, I-FLOW CORPORATION, alleges as follows:

PREAMBLE

1. Pain pumps are medical devices that surgeons used to manage post-operative pain. Orthopedic surgeons used pain pumps after surgery to deliver, by way of a catheter, continuous doses of pain relief anesthetic for several days directly into the shoulder.

2. The pumps first used in the 1990s had limited amounts of anesthetic, and surgeons placed the pain pump catheter in the muscle or outside the shoulder joint. Over the years, however, the manufacturers increased the anesthetic capacity of the pumps (high volume), and with the knowledge and encouragement of the pain pump

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

203408

manufacturers, surgeons began to insert the catheter directly into the shoulder joint space.

3.  Continuous injection of these anesthetics directly into the shoulder joint can cause serious and permanent damage to the shoulder joint cartilage.  The damage occurs when the anesthetic kills the chondrocytes (cartilage cells) and causes cartilage to degenerate progressively.  Patients injured by pain pumps develop a condition called "chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint.  It is an irreversible, disabling, and extremely painful condition.  These patients typically require additional surgeries, including complete shoulder joint replacement.  As written in the medical literature, "the prognosis for these shoulders is grim."[1]

4.  The pain pump companies manufactured and marketed these devices without doing a single study to determine the safety of high-volume pain pumps, or what damage could be caused when physicians placed the catheter directly into the shoulder joint space.  Instead, the pain pump manufacturers encouraged orthopedic surgeons to use the pumps and anesthetics, in tandem, in an untested and dangerous manner.

5.  Indeed, the pain pump manufacturers sought approval from the Food and Drug Administration (FDA) for the placement of the catheter in the shoulder joint space beginning in the late 1990s.  For lack of safety information, the FDA *rejected* their applications for orthopedic and intra-articular placement.  Yet, the pump manufacturers chose not to advise physicians about these dangers, not to advise patients of these

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

risks, not to tell physicians that their FDA applications were rejected, and continued to sell and market these pumps with reckless indifference – all to the detriment of thousands of patients generally, and Mr. Patton in particular.

6.   On November 13, 2009, the FDA issued a directive in which it noted that pain pumps and the anesthetics used in them were defective for their failure to warn regarding the risk of shoulder chondrolysis and directed pain pump and anesthetic manufacturers to include such warnings.   The FDA further noted that the information on dose administration was insufficient in so far as there was no information about maximum daily dose or intra-articular use with pain pumps.   Although this FDA directive was based upon reported adverse events of chondrolysis, this information was known or knowable to the pain pump and anesthetic manufacturers.

7.   Beginning in 2004, multiple scholarly studies were published demonstrating the toxic effects of pain pump anesthetics on shoulder cartilage.   By late 2005 and early 2006, the pain pump industry knew that Dr. Charles L. Beck, an orthopedic surgeon, was reporting to the scientific community some very disturbing findings.   He found a significant number of his shoulder patients developed chondrolysis following intra-articular placement of a pain pump catheter, and he associated these injuries with the use of intra-articular pain pumps.

8.   Had the Defendants conducted those studies that the FDA required back in the 1990s, as they were obligated to do, they would easily have determined that exposure to pain pump anesthetics over time in the shoulder is exceedingly dangerous and contraindicated.   Had they performed the appropriate tests timely, Mr. Patton's

---

[1] Petty, D.H. *et al.*, *Glenohumeral Chondrolysis After Shoulder Arthroscopy,*

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

physicians would not have used pain pumps in the joint space, and Mr. Patton would not have suffered the devastating effects of shoulder chondrolysis.

PARTIES

9.  Plaintiff, David B. Patton, II. (hereinafter sometimes referred to as "Plaintiff"), is a citizen of the state of Arizona, Maricopa County, residing at 515 E. Carefree Highway #240, Phoenix, Arizona 85085.

10. Defendant, I-Flow Corporation (hereinafter referred to as "I-Flow"), is a Delaware corporation with its principal place of business at 20202 Windrow Drive, Lake Forest, California 92630.   I-Flow designs, manufactures, and develops pain pumps.   At all times relevant hereto,    I-Flow was engaged in the testing, manufacturing, labeling, marketing, distributing, promoting and selling of pain pumps in Arizona.

JURISDICTION AND VENUE

11. The Court has diversity jurisdiction over the parties pursuant to 28 U.S.C § 1332 insofar as the parties are citizens of different states.

12. Venue is proper in this jurisdiction pursuant to 28 U.S.C § 1391(a)(2) because I-Flow regularly solicits and engages in business and other persistent courses of conduct and derive substantial revenues from goods used in the State of Arizona.   I-Flow is a corporation maintaining sufficient minimum contacts with this judicial district to subject it to personal jurisdiction here.   A substantial part of the events giving rise to this claim occurred in this district as Plaintiff, David B. Patton, has

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

---

Am. J. Sports Med. 32:(2)509 (2004).

1  at all relevant times resided in this judicial district, Mr. Patton was administered a pain

2  pump in this district, and Mr. Patton sustained injury in this district.

3
4        13. The amount in controversy in this matter exceeds $75,000.00, exclusive of

5  interest and costs.

6                          FACTUAL ALLEGATIONS

7        14. On February 3, 2005, Plaintiff, David B. Patton, II., was a 42 year old man

8  living in Phoenix, Arizona, when he consulted with his orthopedic surgeon, Theodore
9
   R. Hofstedt, M.D., regarding a problem he was experiencing with his right shoulder.
10
11  Dr. Hofstedt reviewed an MRI of Mr. Patton's shoulder taken in early 2005 which

12  revealed "biceps tendonitis of the right shoulder with superior labral tear."  Dr. Hofstedt

13  recommended arthroscopic surgery.

14        15. On February 16, 2005, Mr. Patton underwent right shoulder arthroscopy at
15
   Metro Surgery Center in Phoenix.  During surgery, Dr. Hofstedt affixed a pain pump
16
17  with a continuously injected anesthetic to Mr. Patton's right shoulder.  Dr. Hofstedt

18  placed the pump in the "glenohumeral joint."  Mr. Patton's pain pump, through a

19  catheter emanating from the pump injected the anesthetic into his joint on a

20  continuous basis following his surgery.  The pain pump used during this surgery was
21
   an ON-Q Painbuster®, REF:   PM014, LOT 432395 manufactured by I-Flow.   The
22
23  anesthetic drug used in the pain pump was .25% Marcaine.

24        16. Three months after his February 16, 2005 surgery, Mr. Patton returned to

25  Dr. Hofstedt complaining of pain and loss of range of motion in his right shoulder.

26  After reviewing updated x-rays, Dr. Hofstedt recommended an additional right shoulder

27  arthroscopy and manipulation.

28

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

17. On May 23, 2005, Mr. Patton underwent arthroscopic surgery on his right shoulder at John C. Lincoln Hospital-North Mountain, in Phoenix. During this surgery, Dr. Hofstedt observed "some grade 2-3 degenerative changes on the humeral head posteriorly inferiorly."  As with the February 16, 2005 surgery, Dr. Hofstedt affixed to Mr. Patton's shoulder a pain pump with a continuously injected anesthetic.   Mr. Patton's pain pump, through a catheter emanating from the pump and implanted through the skin and into his joint, injected the anesthetic on a continuous basis following his surgery.  The pain pump used during the May 23, 2005 surgery was an ON-Q Painbuster®, REF:   PM014, LOT 512898, manufactured by I-Flow and the anesthetic drug used in the pain pump was .25% Marcaine.

18. On October 1, 2008, Mr. Patton consulted with orthopedic surgeon, Bryan Wall, M.D., at the CORE Institute in Phoenix.   Mr. Patton reported that he was suffering from ongoing pain in his right shoulder, at night and in daily activities.  X-rays were taken and Dr. Wall noted "osteoarthrosis glenohumeral joint."  On October 14, 2008, Mr. Patton underwent an MRI of his right shoulder.  Dr. Wall's observation after reviewing the MRI, was "severe grade IV degenerative change in the glenohumeral joint" and "marked deformity of the humeral head and  glenoid" as well as "mild supraspinatus muscle atrophy and tendinosis without cuff tear."

19. On October 20, 2008, Mr. Patton returned to Dr. Wall for an evaluation.  At that time, Dr. Wall opined that Mr. Patton developed "significant chondrolysis" in the right shoulder.  Dr. Wall discussed the available surgical treatment options with Mr. Patton.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

20. Mr. Patton met with Dr. Wall for a reevaluation on October 29, 2008, at which time Dr. Wall believed his primary issue was "chondrolysis" and suspected that it was "related to an intraarticular pain pump."  It was during this office visit with Dr. Wall when Mr. Patton first discovered the association between use of pain pumps and shoulder chondrolysis. Dr. Wall and Mr. Patton again discussed surgical treatment options and Mr. Patton agreed that his only option regarding his right shoulder would be a total shoulder arthroplasty.

21. The continuous injection of anesthetic drugs over time directly into Mr. Patton's shoulder joint after his February 16, 2005 and May 23, 2005 surgeries caused him serious and permanent cartilage damage.  As a result, Mr. Patton suffered a narrowing of the joint space and/or a condition called "glenohumeral chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint, an irreversible, disabling, and extremely painful condition. Mr. Patton currently has and will continue to have difficulty doing the most basic tasks of everyday living.  He has already undergone and will require additional surgeries, including possible shoulder transplants and/or the insertion of an artificial shoulder, as a result of the narrowing of the joint space and/or chondrolysis caused by the dangerously defective pain pump. Mr. Patton's daily life is consumed with the devastation of a destroyed shoulder, lack of range of motion, and the prospects of a life of pain and medication.  He will suffer lost income, loss of career options, a loss of enjoyment of life, and other damages, all of which were avoidable.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

## FRAUDULENT CONCEALMENT

22. Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts by I-Flow, as alleged herein.  Mr. Patton and his physicians were kept in the ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Mr. Patton could not reasonably have discovered the dangerous nature of and the unreasonable adverse side effects associated with the intra-articular use of infusion pain pumps with commonly used anesthetics following shoulder surgeries prior to October 29, 2008.

23. I-Flow is and was under a continuing duty to disclose the true character, quality, and nature of its pain pumps.  Because of I-Flow's concealment of the true character, quality and nature of its pain pumps, I-Flow is estopped from relying on any statute of limitations defense.

## CAUSES OF ACTION
## COUNT I – NEGLIGENCE

24. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

25. At all times relevant to this action, I-Flow had a duty to exercise reasonable care, and to comply with the existing standards of care, in their preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion and sale of the pain pumps and the anesthetics used in the pumps, which I-Flow introduced into the stream of commerce, including a duty to ensure that users would not suffer from unreasonable, dangerous or untoward adverse side effects.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

26. At all times relevant to this action, I-Flow had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of pain pumps and the anesthetics used in the pumps.

27. At all relevant times, I-Flow knew or reasonably should have known that the pain pumps were unreasonably dangerous and defective when used as directed and as designed, including but not limited to the following particulars:

> a. Commonly used anesthetics likely to be used in pain pumps were harmful to human and animal articular cartilage and that toxicity to cartilage increased with the duration of exposure;
>
> b. Use of pain pumps with continuously injected anesthetic in the shoulder joint space had not been approved by the FDA, and in fact had been specifically rejected by the FDA;
>
> c. Continuous injection of anesthetic through a catheter, directly into the shoulder, for two days or more, had not been adequately tested for safety or effectiveness; and
>
> d. The risk of narrowing of the joint space, chondrolysis and other serious post-operative problems associated with using pain pumps with continuously injected anesthetic as designed and instructed outweighed the possible benefits of such use.

28. Based on what I-Flow knew or reasonably should have known as described above,  I-Flow deviated from principles of due care, deviated from the standard of care, and was otherwise negligent in one or more of the following particulars:

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

a.  In failing to conduct those tests and studies necessary to determine that the use of pain pumps directly into the shoulder was dangerous to shoulder cartilage and contraindicated for use;

b.  In failing to instruct or warn the medical community that the safety of the pain pump with continuously injected anesthetic had not been established for use in the shoulder;

c.  In failing to disclose to the medical community that continuous injection of commonly used anesthetics such as sensorcaine, with or without epinephrine, over two days or more, into the shoulder, may cause serious and permanent injury to the joint cartilage;

d.  In failing to include a precaution against placing the catheter of the pain pump in the shoulder;

e.  In failing to provide to the medical community adequate instructions for the safe use of the devices with continuously injected anesthetics;

f.   In failing to disclose to the medical community that the effectiveness of pain pumps with continuously injected anesthetic was uncertain for use in the shoulder;

g.  In failing to disclose to the medical community that no tests had been ever done to determine the safety of using the pain pump in the shoulder;

h.  Manufacturing a product to be used with continuously injected anesthetic, designed to directly inject into the shoulder commonly used anesthetics associated with damage to articular cartilage;

BEGAM
&
MARKS
A PROFESSIONAL
ASSOCIATION

  i. Manufacturing a product designed to deliver, over time, dangerously high doses of anesthetic drugs directly into shoulder tissue; and

  j. Promoting pain pumps and continuously injected anesthetics for use in the shoulder joint space after the FDA had considered and rejected such an indication.

29. At all relevant times, I-Flow knew or reasonably should have known that the anesthetics used in the pain pumps were unreasonably dangerous and defective when used as directed and designed, including but not limited to the following particulars:

  a. Commonly used anesthetics likely to be used in pain pumps were harmful to human and animal articular cartilage;

  b. Use of pain pumps with continuously injected anesthetic in the shoulder joint space had not been approved by the FDA, and in fact had been specifically rejected by the FDA;

  c. Continuous injection of anesthetic through a catheter, directly into the shoulder, for two days or more, had not been adequately tested for safety or effectiveness; and

  d. The risk of narrowing of the joint space, chondrolysis and other serious post-operative problems associated with using pain pumps with continuously injected anesthetic as designed and instructed outweighed the possible benefits of such use.

30. The product defects alleged above were a substantial contributing cause of the injuries and damages suffered by Mr. Patton that would not have occurred but for the use of the product.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

31. The injuries and damages suffered by Mr. Patton were the reasonably foreseeable results of I-Flow's negligence.

32. Had I-Flow performed those tests and studies necessary to determine that pain pumps and their anesthetics should not be used directly in the shoulder before Mr. Patton's physician used a pain pump following his surgeries, as it was required to do, Mr. Patton would not have developed chondrolysis and suffered the injuries and damages described with particularity, above.

33. I-Flow is directly liable for the negligent conduct of its actual and/or ostensible employees, servants, and agents, who include, but are not limited to, its sales representatives.   The negligent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Mr. Patton.

34. As a direct and proximate cause of I-Flow's negligence, Mr. Patton suffered the permanent loss of cartilage in his shoulder, resulting in severe pain and discomfort of the shoulder, loss of use and function of the shoulder and arm, and requiring additional surgical intervention.   Mr. Patton will also require future medical care, including physical therapy, pain management, additional shoulder surgeries as he ages, including but not limited to, shoulder replacements.  In addition, Mr. Patton has suffered mental distress and anguish and permanent impairment of the use and function of his affected upper extremities, and other damages.

<u>COUNT II – NEGLIGENT MISREPRESENTATION</u>

35. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

36. I-Flow, in the course of its business, negligently misrepresented and failed to disclose material facts concerning the risks of their pain pumps and anesthetics posed to patients, particularly those using the products for pain relief following shoulder surgery.

37. I-Flow knew or should have known, under the circumstances, that those misrepresentations were false.

38. Those misrepresentations and concealments by I-Flow were made with the intent to more effectively advertise, market, and sell pain pumps and anesthetics off label.

39. As such, I-Flow failed to exercise reasonable care of competence in obtaining or communicating truthful and accurate information to Plaintiffs and Plaintiffs' physicians, and failed to comply with the existing standard of care.

40. I-Flow is directly liable for the negligent conduct of their actual and/or ostensible employees, servants, and agents, who include, but are not limited to, its sales representatives.  The negligent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Plaintiffs.

41. Mr. Patton and his physicians justifiably relied on the misrepresentations and concealments, and as a direct and proximate result of such reliance, Mr. Patton suffered and will continue to suffer injuries, damages, and losses as alleged herein.

<u>COUNT III – FRAUD</u>

42. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

43. On May 28, 1998, the FDA approved I-Flow's PainBuster Infusion System for intraoperative use in the soft tissue or body cavity. However, for lack of safety, the FDA denied I-Flow's requests for intra-articular and orthopedic uses:

    a.  On August 20, 1998, I-Flow submitted a 510(k) (K982946) to the FDA seeking to expand the indications for the PainBuster Infusion Kit to include "continuous infusion of a local anesthetic directly into the intraoperative or intra-articular site for postoperative pain management."

        i. On September 2, 1998, I-Flow issued a press release entitled "I-Flow Corporation (NASDAQ) Signs Letter of Understanding with Smith & Nephew, Inc. to Market I-Flow's 'PainBuster' Infusion Pain Management Kit for Orthopaedic applications," stating that I-Flow received approval in June 1998 from the U.S. Food and Drug Administration to market the PainBuster in the United States for orhtopaedic surgery applications. This statement was false. In fact, I-Flow never received such approval.

        ii. The FDA denied I-Flow's application for intra-articular use because I-Flow failed to provide any evidence of safety to satisfy an indication for intra-articular use or for orthopedic surgery.

        iii. Instead, the FDA approved the PainBuster for the Revised Indications for Use (Nov. 9, 1998), as follows: "The PainBuster is intended to provide continuous infusion of a local anesthetic directly into an intraoperative (soft tissue/ body cavity) site for general surgery for postoperative pain management. Additional

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

routes of administration include percutaneous and subcutaneous infusion."

iv. The FDA did not clear the PainBuster to be marketed for intra-articular administration, nor was it approved for orthopedic surgery as I-Flow withdrew this orthopedic use indication at the FDA's request.

b. On November 11, 1998, I-Flow submitted a 510(k) (K984146) to the FDA to extend the administration set product line for its existing Paragon (intravenous) infusion system (K923875).  On January 13, 1999 I-Flow submitted to the FDA a revised "Indications for Use" to be used with its Paragon Infusion Kit to include synovial infusions as an additional indication for use based on another pump manufacturer, McKinley's, inclusion of synovial cavity infusion as an indication for use.  In response, the FDA denied I-Flow's submission and stated that McKinley would also be required to modify its Indications for Use Statement to remove synovial cavity infusions.  On February 9, 1999, the FDA cleared I-Flow's Paragon Infusion Kit for continuous infusion into the intraoperative site and for percutaneous, subcutaneous, intramuscular and epidural infusion as additional routes of administration.  And, on March 3, 1999, the FDA sent out a correction letter to McKinley removing the synovial cavity infusion indication for use.

44. Despite FDA's denials of I-Flow's applications for approval to market the PainBuster for orthopedic use and for use in the joint space, on May 12, 1999, I-Flow

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

and DJO entered into a Distribution Agreement which defined the PainBuster as a product that is used for continuous infusion of local anesthetics into the joint space. Thus despite the denials, I-Flow and DJO treated the PainBuster as if it were cleared for orthopedic and intra-articular use.

45. Undeterred by the FDA's denials, and in violation of the Code of Federal Regulations, as illustrated in the paragraphs that follow, I-Flow continued to promote its pain pumps for both intra-articular and orthopedic use.

46. As illustrated in the paragraphs that follow, I-Flow and its agents and sales representatives knowingly, intentionally, directly and/or impliedly made material misrepresentations to Plaintiff, Plaintiff's physicians, and to the public that pain pumps, including the pain pump used in Mr. Patton's shoulder, and the anesthetics used in the pumps were safe for use following shoulder surgeries, such as Mr. Patton's.

47. The representations by I-Flow's agents and sales representatives were in fact false, as pain pumps and the anesthetics used in the pumps were not safe for human use following shoulder surgeries, and instead proximately caused narrowing of the joint space, glenohumeral chondrolysis and other injuries and/or adverse side effects.

48. When I-Flow's agents and sales representatives made these representations that their pain pumps and the anesthetics used in the pumps were safe for use following shoulder surgeries such as Mr. Patton's, they knew those representations were false, deceptive, and misleading, and they made those false representations with the intent to defraud, deceive, and mislead. For example, on July 21, 1999, Robert Bard, the vice president of regulatory affairs for I-Flow, admitted to

Kevin Sumstine of  DJO, who had contracted with I-Flow to sell its pain pumps to orthopedic surgeons, that despite three attempts to secure synovial cavity use in their 510(k), the FDA had rejected this use each and every time.  Thus, I-Flow marketed its pain pumps, including the pain pump used in Mr. Patton's surgery, for orthopedic use in the joint space knowing it was not approved for those purposes with the intent to defraud, deceive, and mislead physicians, including Mr. Patton's.

49. In February and May of 2005, Mr. Patton, his physicians, and the public justifiably relied upon the misrepresentations of I-Flow's agents and representatives and reasonably believed the misrepresentations to be true, and in justifiable reliance upon these misrepresentations, were induced to prescribe and use its pain pumps and the continuously injected anesthetics.

50. I-Flow utilized multiple marketing tools and methods to promote this off-label use that had been specifically rejected by the FDA. In fact, I-Flow engaged in full spectrum marketing of their pain pumps to orthopedic surgeons, including comprehensive marketing (dinner meetings, I-Flow appreciation night with ball games, cruises, etc., physician reimbursement lunches); value added programs (pens, post-it notes, and other giveaways); resource utilization (inside sales); education (in-service materials, catheter placements); incentive programs (patient challenges, support team appreciation gifts); and partnership marketing with distributors and drug companies. All of these marketing techniques are described in I-Flow's "One-to-One Marketing Tactics" authored by Vice President of Marketing, Orlando Rodrigues, on February 5, 2004.

51. Through its marketing techniques, I-Flow made representations that its pain pumps, including the pain pump used in Mr. Patton's surgeries, and the anesthetics used in the pumps were safe for use following shoulder surgeries such as Mr. Patton's.  For example,

a. I-Flow sales representative, Cheryl Pritchard, testified on February 20, 2009, that I-Flow trained sales staff specifically to promote orthopedic, intra-articular use;

b. I-Flow equipped sales staff with direction sheets for techniques regarding placement of the pump within the joint and used medical liaisons to give favorable presentations at conferences.  For example, on October 16, 2006, I-Flow Group Marketing Director, Julie Schneider provided to a Territory Manager a PowerPoint presentation to show to an orthopedic surgeon that might serve as one of I-Flow's speakers.  Two of the slides in that presentation discuss glenohumeral joint placement.

c.  In fact, I-Flow prepared PowerPoint presentations for physicians to use, which included slides expressly stating that the pumps were particularly useful in shoulder and other joint surgery. One such PowerPoint was sent from I-Flow Field Sales to doctors and customers on or about May 10, 2001.  Another such PowerPoint was developed by I-Flow marketing employee, Kathy Thompson, on or about November 26, 2001, and described orthopedic shoulder procedures indicating catheter placement in the joint.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

d.  I-Flow's marketing went so far as to instruct physicians on catheter placement.  For example, I-Flow developed ON-Q Catheter Placement Technique guides which specified that the pain pump catheters could be placed intra-articular (in the joint space).  One such guide was developed by I-Flow on or about July 10, 2002 for a presentation by a surgeon at Green Hospital/Scripps clinic in San Diego.

e.  In addition, I-Flow created marketing brochures that were available in the orthopedic surgeons' offices across the country, including Arizona, explaining to the patient that a pain pump had been placed in the joint to provide pain relief following surgery; and, that there was nothing that the patient needed to do; the pump worked by itself. For example, one such document was created by I-Flow on or about October 21, 2005 for use by an orthopedic physician in Brighton, Michigan.

52. When  I-Flow  and  its   agents  and  sales  representatives  made  these representations that its  pain pumps and the anesthetics used in the pumps were safe for  use  following  shoulder  surgeries  such  as  Mr.  Patton's,  it  knew  those representations were false, deceptive, and misleading, and they made those false representations with the intent to defraud, deceive, and mislead.

53. Roger Massengale, Director of Marketing and Business Development for I-Flow, testified on July 1, 2008 that I-Flow never studied, nor commissioned a study to determine the safety of its infusion pain pumps using commonly used anesthetics in the shoulder.  Yet, I-Flow continued to market these products for that use.

54. Alan Dine confirmed in his deposition on December 16, 2008 that an efficacious and safe dosage for intra-articular administration had never been determined in any clinical study designed by I-Flow for this purpose. Yet, I-Flow continued to market its pain pumps products for that use.

55. I-Flow had actual notice that patients were suffering devastating injuries to their joints when I-Flow pain pumps were used in orthopedic surgeries.   For example, I-Flow first received reports of chondrolysis on July 27, 2004, when I-Flow Territory Manager, Cheryle Pritchard, reported to Alan Dine, I-Flow's Director of Clinical Research that eight college age patients had developed chondrolysis following use of a pain pump.  Mr. Dine testified on December 16, 2008 that he did not to investigate these reports; indeed, he did not to follow up with Ms. Pritchard regarding these complaints, and he did not to attempt to contact the physician, Dr. James Andrews, whose patients were the subject of Ms. Pritchard's report to Mr. Dine. Ms. Pritchard's report occurred two months after an FDA officer wrote an article in the journal, *Anesthesiology*, discussing adverse events reported to the FDA that were associated with the use of pain pump systems.  Yet, in violation of FDA regulations, I-Flow did nothing to investigate the circumstances surrounding this report.

56. Undaunted, I-Flow continued to provide physicians with information about placing the pain pump catheter into the joint space.

57. I-Flow is directly liable for the negligent and/or fraudulent conduct of its actual and/or ostensible employees, servants, and agents, who include, but are not limited to, its sales representatives.  The negligent and/or fraudulent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally,

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Mr. Patton.

58. As a result of the fraud of I-Flow's agents and sales representatives, Mr. Patton suffered and will continue to suffer injuries, damages, and losses as alleged herein.

COUNT IV – STRICT PRODUCT LIABILITY

59. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further allege:

60. I-Flow placed its pain pumps into the stream of commerce.

61. Mr. Patton was given a pain pump with anesthetic as prescribed by his physician in a manner that the Defendants intended their products to be used.

62. I-Flow placed its pain pumps into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

63. The products were defective in design and/or formulation because, when they left  I-Flow's hands, the foreseeable risks of use following shoulder surgery exceeded the benefits associated with the design and/or formulation.

64. The products were expected to and did reach Mr. Patton without substantial change in condition.  Alternatively, the products manufactured and/or supplied by I-Flow were defective in design or formulation because when they left I-Flow's hands, they were unreasonably dangerous and more dangerous than an ordinary consumer would expect.

65. The products were defective due to inadequate warnings and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of such studies.

66. The products were defective due to inadequate pre- and post-marketing warning or instruction because, after I-Flow knew or should have known of the risk of injury from their products, they failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

67. The pain pumps and anesthetics manufactured, distributed, tested, sold, marketed, advertised and represented defectively by I-Flow were a substantial factor in bringing about the Mr. Patton's injuries that would not have occurred but for the use of the product.

68. As a direct and proximate result of the defective condition of I-Flow's products, Mr. Patton suffered and will continue to suffer injuries, damages, and losses as alleged herein.

<u>COUNT V – STRICT TORT LIABILITY - FAILURE TO WARN</u>

69. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

70. I-Flow manufactured pain pumps and placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

**BEGAM
&
MARKS**

A PROFESSIONAL
ASSOCIATION

71. I-Flow's pain pumps and anesthetics were defective due to inadequate warnings and/or inadequate clinical trials, *in vivo* and *in vitro* testing and study, and inadequate reporting regarding the results.

72. I-Flow's pain pumps and anesthetics were defective due to inadequate post-marketing warnings or instructions because, after I-Flow knew or should have known of the risk of injury from its pain pumps and anesthetics, I-Flow failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

73. The defective warnings were a substantial factor in bringing about the injuries to Plaintiffs that would not have occurred but for the use of the product.

74. As a direct and proximate cause of the defective condition of I-Flow's pain pumps, specifically their failure to warn and their other negligence, carelessness, and other wrongdoing and actions described herein, Plaintiffs suffered those injuries and damages as described with particularity above.

<u>COUNT VI – BREACH OF IMPLIED WARRANTY</u>

75. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

76. Plaintiff purchased and/or ultimately obtained a pain pump from I-Flow.

77. I-Flow impliedly warranted that their pain pumps were of merchantable quality and safe and fit for the use for which they were intended.

78. Plaintiff relied on the skill and judgment and implied warranty of I-Flow that their pain pumps were of merchantable quality and safe and fit for the use for which they were intended.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

79. Contrary to I-Flow's implied warranty, their pain pumps were not of merchantable quality and were neither safe nor fit for the use for which they were intended, in that they had serious risks of harm and dangerous propensities when put to their intended use, and would instead cause severe injuries to users of the pain pumps, including Mr. Patton.

80. As a result of I-Flow's breach of implied warranty, Mr. Patton suffered and will continue to suffer injuries, damages, and losses as alleged and described herein.

<u>COUNT VII – VIOLATION OF ARIZONA CONSUMER FRAUD ACT</u>
<u>A.R.S. § 44-1521 *et seq.*</u>

81.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

82.    Plaintiff is a person within the meaning of the Arizona Consumer Fraud Act (the "Act").

83.    I-Flow Corporation  is a person within the meaning of the Act for all purposes therein.

84.    The false, deceptive and misleading statements and representations made by I-Flow alleged above are unlawful practices within the meaning of the Act.

85.    I-Flow engaged in the unlawful practices alleged above and those unlawful practices occurred or were committed in the course, vocation or occupation of I-Flow's medical device business.

86.    The unlawful practices that I-Flow committed as alleged above significantly impacts the public as actual or potential customers of I-Flow Corporation.

87.     As a direct and proximate cause of I-Flow's unlawful practices committed in violation of the Act, Plaintiff suffered injuries, damages and losses as alleged herein.

88.     Mr. Patton is entitled to all damages permitted by A.R.S. § 44-1528 and § 44-1534 of this Act, including actual damages sustained, civil penalties, attorneys' fees and costs of this action.  Also, the State of Arizona is entitled to statutory penalties from I-Flow for each violation of the Act pursuant to § 44-1531.

## COUNT VIII- PUNITIVE DAMAGES

89. Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

90. Defendant I-Flow engaged in a prolonged, wanton and malicious course of conduct, with conscious and deliberate disregard of a serious risk to the health, safety, rights and interests of Plaintiffs and many other patients, in one or more of the following respects:

   a. Defendant I-Flow knew that the FDA had repeatedly refused to clear an indication for use of I-Flow's pain pumps in the joint space, but I-Flow failed to disclose the repeated FDA rejections to the U.S. medical community;

   b. Defendant I-Flow failed to undertake the necessary research, analysis and testing to determine the safety of its pain pumps within the joint space before distributing its pain pumps, knowing that the pumps would be used in this manner, and failed to disclose to the U.S. medical community that

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

the safety of using the pain pumps within a joint space was uncertain, unknown, and unpredictable;

c. Defendant I-Flow failed to disclose to the U.S. medical community that use of the pain pumps within the joint space was an "off-label" use, which had never been approved or cleared by the FDA;

d. Defendant I-Flow failed to promptly investigate and report to the FDA once they began receiving reports of dozens of patients who had allegedly suffered injury to their cartilage following use of pain pumps within their shoulder joints, and even failed to consider such cases as complaints relating to the safety of its pain pumps;

e. Defendant I-Flow failed to disclose to its own sales force that the FDA had repeatedly rejected I-Flow's proposed indication for use of its pain pumps within the joint space.  Nor did I-Flow disclose to its sales force reports it received of several patients who allegedly suffered injury to their cartilage following use of pain pumps within their shoulder joints.

f. Defendant I-Flow actively promoted the use of its pain pumps within the joint space despite knowing such use had never been cleared by FDA, and that promotion and marketing of its pain pumps for use within the joint space violated federal law;

g. Defendant I-Flow failed to warn the U.S. medical community of the known risk of serious and permanent injury to cartilage associated with the use of pain pumps within the joint space in a manner reasonably likely to meaningfully warn the U.S. medical community, for a prolonged period of

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

time after I-Flow became aware of the existence and seriousness of the risk; and

h.   Defendant I-Flow put its own profits ahead of a serious risk of harm to the health, safety, and well-being of Mr. Patton and many others.

91.    Plaintiff is entitled to punitive damages because I-Flow's conduct and failure to warn was intentional, wanton, willful and/or outrageous, and said conduct was committed with gross negligence, reckless disregard of, and deliberate, callous and reckless indifference to Plaintiff's rights, interests, welfare and safety.    The Defendants misled both the medical community and the public at large, including the Plaintiff herein, by making false representations about the safety of their products. The Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects associated with the use of their products despite available information demonstrating these products were likely to cause serious side effects to the users.

92.    I-Flow was or should have been in possession of evidence demonstrating that their products caused serious side effects.    Nevertheless, they continued to market the products by providing false and misleading information with regard to safety and efficacy.

93.    I-Flow failed to provide warnings that would have dissuaded medical providers from using the pain pumps, thus depriving medical providers and consumers from weighing the true risks against the benefits of using the pain pumps.

94. I-Flow's acts, conduct and omissions as alleged above and incorporated herein were willful and malicious and were done with a conscious disregard for the

rights of Mr. Patton and other users of the pain pump and for the primary purpose of increasing I-Flow's profits from the sale and distribution of the pain pump.

95. As a direct and proximate cause of I-Flow's actions as alleged herein, the Plaintiffs have suffered injuries, damages and losses as set forth in this complaint.

96. I-Flow's willful, malicious, outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount to be determined at a trial of this action.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1.   Economic and non-economic damages and damages for pain and suffering and loss of basic and pleasurable activities in an amount in excess of $75,000 as provided by law and to be supported by the evidence at trial;

2.   For compensatory and other damages according to proof;

3.   For punitive damages according to proof;

4.   For disgorgement of profits;

5.   For an award of attorneys' fees and costs;

6.   For prejudgment interest and the costs of suit; and

7.   For such other and further relief as this Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION

Respectfully submitted this 3rd day of May, 2010.

BEGAM & MARKS, P.A.


By: /s/ Serena C. Montague
Serena C. Montague, Esq.
smontague@begamlaw.com
111 W. Monroe St. Suite #1400
Phoenix, Arizona 85003
Telephone: 602-254-6071
*Attorney for Plaintiff*


*Co-Counsel:*


Robert K. Jenner, Esq.
JANET, JENNER & SUGGS, LLC
1829 Reisterstown Road, Suite 320
Baltimore, Maryland 21208
(410) 653-3200 / (410) 653-6903 (fax)
RJenner@medlawlegalteam.com

Irwin B. Levin, Esq.
Gregory L. Laker, Esq.
Jeffrey S. Gibson, Esq.
COHEN & MALAD, LLP
One Indiana Sq., Ste. 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481
GLaker@cohenandmalad.com

BEGAM
&
MARKS

A PROFESSIONAL
ASSOCIATION